# In the United States Court of Federal Claims

Nos. 07-816L, 07-822L

(Filed December 30, 2009)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **THE GEORGE FAMILY TRUST, By** | * | Takings claims for flooding and |
| **and Through Its Trustees, JOHN P.** | * | flood damage; stabilization |
| **GEORGE, JULIA P. PAPA, and** | * | doctrine; accrual suspension |
| **JERRY GEORGE, Trustees,** | * | rule; motion to dismiss for lack |
| | * | of subject matter jurisdiction, |
| Plaintiffs, | * | RCFC 12(b)(1); statute of |
| | * | limitations, 28 U.S.C. § 2501 |
| v. | * | (2006); motion to dismiss for |
| | * | failure to state a claim upon |
| **THE UNITED STATES,** | * | which relief can be granted, |
| | * | RCFC 12(b)(6). |
| Defendant. | * | |
| | * | |
| _____ | * | |
| | * | |
| **THE ELIZABETH STONE TRUST, By** | * | |
| **and Through ELIZABETH STONE,** | * | |
| **Trustee; and THE HS 97 TRUST, U/A/D** | * | |
| **12/22/1997, By and Through DR.** | * | |
| **PHILLIP S. STONE, Trustee,** | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | |
| **THE UNITED STATES,** | * | |
| | * | |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * | * | |

<u>William R. Mayo</u>, Fayetteville, AR, for plaintiffs.

<u>Frank J. Singer</u>, Washington, DC, with whom was <u>Acting Assistant Attorney General John C. Cruden</u>, for defendant.

## MEMORANDUM OPINION AND ORDER

**MILLER**, Judge.

Before this court is defendant's motion to dismiss the consolidated actions of plaintiffs The George Family Trust (the "George Trust") and The Elizabeth Stone Trust (the "Stone Trust") for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1). The two plaintiff trusts and the individual plaintiffs who sue along with them (collectively "plaintiffs") own water-damaged riparian properties on tributaries to the White River in Arkansas. Plaintiffs document approximately fifty years of irregular, unnatural, and recurring flooding which they blame on the operation of upstream dams by the United States Corps of Engineers (the "Corps"), with resulting pernicious effects that they allege to be a taking warranting just compensation under the Fifth Amendment to the U.S. Constitution. Both have found damaged timber on uncultivated land; the George Trust identifies affected crop-land, as well. Defendant contends that the applicable statute of limitations, 28 U.S.C. § 2501 (2006), has expired and moves to dismiss. In the alternative, and solely with respect to the Stone Trust, defendant moves for summary judgment pursuant to RCFC 56(c) for failure to make a prima facie showing of causation. Argument is deemed unnecessary.

## BACKGROUND

The George Trust and the Stone Trust filed separate but almost identical complaints on November 26, 2007. Defendant separately answered the complaints on January 25, 2008. After transfer of the Stone Trust case to the undersigned on March 19, 2008, the court consolidated the actions on March 20, 2008, finding that the actions involve common questions of law and fact and that consolidation avoids unnecessary costs or delay. <u>See</u> RCFC 40.2(b)(2). Plaintiffs filed one amended complaint on December 22, 2008. The George Trust claimed additional damages; the Stone Trust's claims were not amended. On February 9, 2009, the court filed *nunc pro tunc* to January 23, 2009, defendant's answer, which belatedly was filed on February 3, 2009.

After the court received the parties' September 2, 2008 joint status report advising of the conclusion of initial fact discovery, the parties undertook extensive expert discovery. On June 29, 2009, defendant filed its motion to dismiss or, in the alternative, motion for summary judgment.

## FACTS

The following facts reflect materials beyond the complaints because jurisdiction is disputed.  Plaintiffs' properties lie within the fan-shaped drainage basin of the White River.  From its source in northwest Arkansas' Ozark Mountains, the White River traverses approximately 720 miles before its confluence with the Mississippi River in southeast Arkansas.  Including the White River and its tributaries, the White River watershed drains approximately 27,818 square miles of Arkansas and Missouri.

The White River flooded in 1937, prompting comprehensive flood-control planning and the Corps's constructing six dam-and-reservoir projects located on the White River and its tributaries (the "Corps Projects").  1/  The Corps Projects and their respective construction and reservoir-filling dates are, in chronological order, as follows:

| Table 1: Corps Projects' Construction/Reservoir-Filling Dates | | | |
|---|---|---|---|
| Corps Project | Construction Begins | Reservoir-Filling Begins | Reservoir-Filling Concludes |
| Clearwater Dam | May 1940 | January 1949 | -- |
| Norfork Dam | October 1940 | June 1943 | February 1945 |
| Bull Shoals Dam | April 1946 | July 1951 | March 1953 |
| Table Rock Dam | October 1952 | November 1958 | May 1960 |
| Greers Ferry Dam | June 1957 | March 1962 | April 1966 |
| Beaver Dam | October 1959 | December 1963 | February 1968 |

_____

        1/   The Corps Projects are Beaver Dam, Table Rock Dam, Bull Shoals Dam, Clearwater Dam, Norfork Dam, and Greers Ferry Dam.  Beaver Dam, Table Rock Dam, and Bull Shoals Dam are on the upper White River.  Beaver Dam is the furthest upstream; water flowing from Beaver Dam collects in Table Rock Dam's reservoir, which, when released through Table Rock Dam, flows to Bull Shoals Dam's reservoir.  Hence, the Corps uses water releases from Bull Shoals Dam to measure aggregate releases from the three Corps Projects on the White River.  Clearwater Dam, Norfork Dam, and Greers Ferry Dam are on White River tributaries—the Black River, the North Fork River, and the Little Red River, respectively—that enter the White River downstream of Bull Shoals Dam.

The Corps Projects regulate approximately 36% (9,886 square miles) of the basin's drainage; the remaining 64% is not controlled by a retention dam.

The Corps Projects are not operated independently, but together allow the Corps to "provide[] for seasonal flood control releases based on agricultural practices of the lower [White River] basin and . . . operate[] for the benefit of the entire White River valley." Declaration of H. Henry Himstedt, June 29, 2009, ¶ 5. Aware that it cannot eliminate all flooding, the Corps aims to reduce peak flood flows in downstream areas. Release-regulation plans, implemented as follows, provide for annual reservoir releases to coincide with flood-pool stages and the agricultural growing season:

| Table 2: Corps Projects' Release Regulation Plans | | |
|---|---|---|
| Corps Project(s) | Regulation Plan Implemented | Regulation Plan Modified |
| Clearwater Dam | pre-1950 | 1950 |
| Norfork Dam, Bull Shoals Dam | June 1952 | December 1955 |
| Beaver Dam, Table Rock Dam, Norfork Dam, Bull Shoals Dam | November 1963 | October 1966 |
| Greers Ferry Dam | March 1963 | November 1966 |

Plaintiffs' riparian properties are located on Prairie Cypress Creek and Big Cypress Creek; both Prairie Cypress Creek and Big Cypress Creek flow into Big Creek, which is a tributary to the White River. Big Creek joins the White River downstream of the Corps Projects. Measured by the White River's path, the Corps Projects are located approximately 134 to 560 miles upstream from the intersection of Big Creek and the White River. Neither the Corps Projects nor any Corps water-control structures sit on Prairie Cypress Creek, Big Cypress Creek, or Big Creek.

The George Trust property is on Prairie Cypress Creek, three miles upstream from the confluence of Prairie Cypress Creek and Big Creek. Prairie Cypress Creek and Big Creek meet approximately 5.5 miles upstream from the point at which Big Creek enters the White River. The Stone Trust's two properties—held by the HS 97 Trust and the Elizabeth Stone Trust, respectively—are on Big Cypress Creek and are "north, adjacent and . . . contiguous" to the George Trust property. Declaration of Jeff George, Aug. 28, 2009, ¶ 4. The HS 97 Trust property is situated at the confluence of Big Cypress Creek and Big Creek, which is

approximately 7.8 miles from Big Creek's confluence with the White River; the Elizabeth Stone Trust property also sits on Big Cypress Creek, 0.8 miles upstream from Big Creek.

Plaintiffs allege that "[p]laintiff[s'] propert[ies] over a period of time [have] been subjected to gradual, periodic and intermittent flooding from backwater from Big Cypress Creek as a tributary of the White River." 2/ George Trust Am. Compl. filed Dec. 22, 2008, ¶ 7. Plaintiffs contend that this "gradual, periodic and intermittent" flooding has damaged the George Trust property's timber and crop-land, id. ¶¶ 8-9, and the Stone Trust properties' timber, see Stone Trust Compl. filed Nov. 26, 2007, ¶ 10. See also Pls.' Br. filed Sept. 2, 2009, at 4.

Jeff George describes the George Trust's damaged crop-land. According to Mr. George, plaintiffs' properties "historically naturally flood each year during the months of November, December and a portion of January for which I have direct and personal knowledge from my observations of these properties [including the land of the Stone Trust] during my lifetime." 3/ George Decl. ¶ 5. Until 2003 a tenant rented cultivated land on the George Trust property to plant and harvest crops. Nevertheless,

> [w]ith respect to the periodic flooding, the pattern of flooding began to change particularly with respect to the cultivated land which is subject to the Plaintiff George Family Trust's Complaint for damages in 2003 when portions of the same began to remain inundated during the planting seasons up through early summer making utilization of the crop lands impossible.

Id. ¶ 6.

Mr. George also details flood-damaged timber on the George Trust property. According to Mr. George, "[w]ith the continuing periodic flooding pattern changes[,] I caused the timber located upon the subject lands to be cruised for a forest evaluation by Blackburn Forestry Services resulting in a Forest Valuation Report dated October 12, 2004 . . . ." Id. ¶ 8. Mr. George asserts that the "George Family Trust was not aware of the nature and extent nor cause of the damage to its timber prior to the Blackburn Report." Id.

---

2/ The Stone Trust's original complaint alleges that "Big Cypress Creek [is] a tributary of the Arkansas River." Stone Trust Compl. filed Nov. 26, 2007, ¶ 9 (emphasis added). This likely is a typographical error, as elsewhere Big Cypress Creek is described as a tributary to the White River. See Declaration of Paul H. Schwartz, P.E., Ph.D., June 29, 2009, ¶ 6.

3/ Mr. George has resided on the George Trust property for approximately fifty years.

¶ 9. The October 12, 2004 "Forest Valuation/Damage Assessment for George Family Trust" prepared by Blackburn Forestry Services, Sean P. Blackburn, R.F. (the "Blackburn Report"), describes a "very degraded forest due to excessive flooding," Blackburn Report at 2, which has caused "[timber] mortality, degradation of the quality of wood products, reduction of normal growth rates, and directly hindered the establishment of natural bottomland hardwood regeneration," id. at 8. The majority of the tree stand had been damaged. Id. Although Mr. Blackburn concluded that factors critical for the development of the stand "have been affected by continuous flooding during the growing season," id. at 2, he advised the George Trust that Blackburn Forestry Services "was not able to determine how many years that this stand has been flooded during the growing season," id. at 8.

Excerpts of William Stone's deposition testimony describe flood-damaged timber on the Stone Trust properties. Mr. Stone acquired his property in 2000, and he first used the property primarily during the duck-hunting season of November, December, and January; he later began visiting the property monthly during the April-through-September "growing season." Deposition of William Stone, July 10, 2008, at 39, 41, 109. The property historically, seasonally, and naturally floods during the duck-hunting season. See id. at 38-39, 41, 108. Although Mr. Stone could not recall specific dates of flooding, he testified that seasonal flood patterns had changed since 2000, resulting in greater flooding from April through September. See id. at 108-11.

According to Mr. Stone, "it came to my attention six years ago or in 2005 that we had a [flooding] problem. [But] I don't know when all of the problems started, per se . . . ." Id. at 104. Prior to 2005 Mr. Stone paid little attention to dead trees on his property, and, when visiting the property during the growing season, Mr. Stone did not go out into the property's timber. See id. at 105, 110. In 2005, however, Mr. Stone was told that the Corps had caused flooding problems; at that time he "started looking . . . and paying attention to it, and . . . . [realized that] [t]here are drastically more dead trees out there now." Id. at 105. Mr. Stone engaged a forester to investigate the timber loss. By letter dated January 28, 2006, the forester, Tom Berry, T.F., of Cherokee Land and Timber Co., Inc., informed Mr. Stone of "abnormal mortality of timber[] and water stress . . . evident throughout the entire stand." Mr. Berry did not link this timber damage to specific incidents of flooding, but offered the anodyne conclusion that "[a] lack of regeneration and mortality in the tops makes it clear that there has been damage done by water standing on the timber during the growing season."

Deposition testimony of Dr. Phillip Stone describes flooding and flood damage on the HS 97 Trust property. Dr. Stone visits the property to hunt—typically when the property floods. See Deposition of Dr. Phillip Stone, July 10, 2008, at 14. Although he could not recall specific dates of flooding, Dr. Stone acknowledged that the property had flooded prior to 2000 and that the property previously has flooded during the April-through-September

6

growing season. See id. at 14-15. Likewise, he could not testify to the comparative frequency of flooding, stating, "I don't know whether [flooding is] more frequent in the past decade or the previous decade." Id. at 20. Dr. Stone concluded that his property had suffered flood-related timber loss after he discovered very little mature, cuttable timber on the property compared with that present on adjacent land. See id. at 21.

Plaintiffs blame the Corps Projects for flood damage to their properties, alleging "[t]hat the losses sustained by the Plaintiff[s] were a direct and proximate result of the gradual, periodic, and intermittent flooding caused by the Defendant through the U.S. Corp[s] of Engineers' use of flood control devices and procedures on the Arkansas River System." George Trust Am. Compl. ¶ 10; see also Stone Trust Compl. ¶ 11. Plaintiffs claim that the "gradual, periodic, and intermittent flooding of the [plaintiffs'] lands for public benefit constitutes a taking without just compensation contrary to the Fifth Amendment . . . ." George Trust Am. Compl. ¶ 11; see also Stone Trust Compl. ¶ 12. Further,

> [a]lthough the Defendant's actions are ongoing, in late 2005, Plaintiff[s] became aware that the resultant damage was caused by the Defendant's actions resulting in the gradual, periodic and recurring flooding affecting Plaintiffs' lands at which time they took action to determine the nature and extent of the taking which had not become clear and were not ascertainable until that time.

George Trust Am. Compl. ¶ 12; see also Stone Trust Compl. ¶ 13.

The George Trust commissioned Dr. Jerry Overton, C.P.G., President and Senior Hydrogeologist/Hydrologist for ATOKA, Inc., to study "the duration of flooding on the [George Trust's] properties during the prime bottomland hardwood growing season, July through September, resulting from the U.[]S. Army Corps of Engineers' . . . management of the White River System." Expert Report, Nov. 1, 2008, prepared by ATOKA, Inc., at 2 (the "Overton Report"). Dr. Overton reviewed the Corps's records of its water-control management on the White River, including "comparative stage-duration evaluation[s] of flood stages along the lower reaches of Big Creek," id. at 6, from November 2006 4/ and

---

      4/ The November 2006 study evaluated river elevation measurements collected from 1967 through 2003. See Overton Report at 6. It stated that "on an average annual basis the results . . . illustrate the increase in duration of [flood] stages below EL 147.0 FT, and the reduction in the duration of [flood] stages above EL 147.0 FT." Id. (omission in original) (internal quotation marks omitted). The November 2006 study concluded that "[i]ncreases in the duration of stages above EL 144 FT that might be considered significant occur only

June 2007, 5/ respectively, and an "Information Report" dated December 18, 2006, see id. at 8. 6/ Dr. Overton criticized the Corps's studies for arbitrarily selecting various elevations by which to assess the impact of the Corps Projects and for "couch[ing] [data] in such a manner that the reader does not see the actual, long-term stage-duration impacts for adjacent bottomland hardwood stands, especially in the lower Big Creek area." Id. at 7. Dr. Overton argued that, rather than the Corps's data, "[w]hat is actually needed is an evaluation of the number of days each month during the critical portion of the growing season, July through September, that specific areas of concern are flooded. This information should then be evaluated over sequences of years . . . ." 7/ Id.

_____

         4/ (Cont'd from page 7.)

in the months of July, August, and September, and are limited to the EL 144 FT to El [sic] 147 FT range in stage . . . ." Id. at 6-7 (omission in original) (internal quotation marks omitted).

         5/ The June 2007 study included a "Previous Studies" section discussing a 1990 Corps analysis concluding that "the duration of flooding for lands lying at or below elevation 150.5 feet had been increased, the duration of flooding for lands lying between elevations 150.5 and 152.0 feet had been occasionally increased, and the duration of flooding for lands lying above elevation 152.0 feet had been decreased." Overton Report at 7 (internal quotation marks omitted).

         6/ The December 18, 2006 information report prepared by the Corps restated the conclusions of the November 2006 study, supra note 4. Overton Report at 8. According to Dr. Overton, it also alluded to a November 2005 report that found "that during the months March through August the elevation 145.0 feet (msl [mean sea level]) is overtopped at the Big Creek RM 5.97. . . . This report points out that the data indicate that the duration of flooding in the July through September timeframe was significantly increased for stages below elevation 148 feet." Id. at 8-9.

         7/ Additionally, Dr. Overton criticized 1) the Corps's river simulations performed in 2004 and 2005 to evaluate the impact of its White River management, and 2) the Corps's argument that bottomland hardwoods have not been damaged by prolonged flooding. Overton Report at 12-14. Regarding the latter, Dr. Overton found that the Corps emphasized the presence of flood-tolerant species when "argu[ing] away that there has been any real change in the timber resources." Id. at 13-14. According to Dr. Overton, however, "it must again be reiterated that the more water tolerant species used in [the Corps's] studies would have become more prevalent . . . due to the documented flooding of these areas since the construction of reservoirs on the white [sic] River and its tributaries." Id. at 14. Were the

Dr. Overton's review of the Corps's communications dated between March 1986 and March 2008 revealed that, since at least March 1986, the Corps was concerned about the Corps Projects' environmental impact. Id. at 10. According to Dr. Overton, a March 1986 letter from Charles Baxter, Field Supervisor of the U.S. Department of Interior's Fish and Wildlife Service (the "FWC"), to Colonel Robert Whitehead of the Corps indicated that a majority of Big Creek's flooding was "from headwater sources[] including river flow directly resulting from releases from [the Corps's] water control structures." Id. Further, from Mr. Baxter's statement that "[t]he bottomland hardwood wetlands . . . are well adapted to frequent and prolonged inundation during the fall, winter, and early spring[, and] [b]y early summer, water levels have historically receded to within banks[,]" id. (omission in original) (internal quotation marks omitted), Dr. Overton extrapolated that the FWC "expect[ed] the [Corps] to not maintain flood waters on bottomland hardwoods during the [summer] growing season," id. at 10-11. Mr. Baxter described some of the consequences of summer flooding to the bottomland hardwoods, as follows:

> 1) The entire year of tree growth and germination is lost.  2) Trees intolerant of prolonged flooding . . . become quickly stressed and suffer considerable mortality. 3) Typically the larger trees . . . are the first to experience stress and mortality.  4) Herbaceous ground cover and regeneration of flood intolerant timber types is oftentimes almost totally absent.

Id. at 11.  A March 21, 2006 Corps memorandum reiterated the pernicious effect of summer flooding on bottomland hardwoods and calculated estimated damages for the Corps's practice of prolonged summer flooding.  See id.

Dr. Overton evaluated data collected by the White River gauging station at St. Charles, Arkansas (the "St. Charles Gauge"). 8/ He used that data because the St. Charles Gauge's river-elevation measurements appropriately depicted flood conditions on the George Trust property.  Dr. Overton found that, "[w]hen the Prairie Cyprus [sic] Creek, which fronts the George Family Trust [p]roperty, reaches a level of 145 feet (msl [mean sea level]), the

---

7/  (Cont'd from page 8.)

Corps not "repeatedly flooding the areas during the growing season, killing those native species that are less tolerant of repeated flooding conditions[,] . . . . it is understood that a very different timber stand would be present."  Id.

8/ Gauging stations are downstream water-regulation control points that measure river elevation, or stage; river elevation is the result of both controlled (Corps-released) and uncontrolled (natural) water flows.  See Schwartz Decl. ¶ 15.

George Family Trust property will begin to flood due to overbank flooding from that creek." Id. at 15.  Based on the St. Charles Gauge's similarly elevated timber and overbanking, he conservatively estimated that the George Trust property would flood when the St. Charles Gauge recorded an elevation of 145 feet (msl). 9/  See id.  Moreover, after analyzing the terrain, he implied that the George Trust property likely could flood before the St. Charles Gauge's elevation measurements reached 145 feet (msl).  See id.

Dr. Overton explained that "[i]t is critical to the survival of high quality bottomland hardwood timber resources that bottomlands be free of inundation [of water above 145 feet (msl)] during [July through September]." Id.; see also supra note 9.  Based on the available data collected by the St. Charles Gauge since 1963, he tallied the following totals for years during which water stages exceeded 145 feet (msl) from July to September:

---

9/  Dr. Overton warned that the 142 feet (msl) elevation is a more appropriate measure for assessing flood-damaged timber, as the 145 feet (msl) elevation failed to register subsurface soil saturation that would continue to impact timber root systems while water levels in the vicinity of Prairie Cypress Creek and Big Creek remained above 142 feet (msl). See Overton Report at 17.  Notwithstanding his own warning, he analyzed the 145 feet (msl) stage, not the 142 feet (msl) stage.  See id. at 23-24.

Dr. Overton assessed July-September as "the critical portion of the growing season." Id. at 7; see also id. at 6-7 ("[The Corps's November 2006 study] further concludes that [i]ncreases in the duration of stages . . . that might be considered significant occur only in the months of July, August, and September . . . ." (internal quotation marks omitted)). "Inundation during the July through September portion of the growing season results in hot, less oxygenated floodwaters that, over successive years, will negatively affect the mortality and regeneration capabilities of bottomland hardwoods." Id. at 20.

| Table 3: Number and Percentage of Years with Greater Than 145 Feet (msl) Stage in July, August, and September (1963-2007) | | | |
|---|---|---|---|
| Month (1963-2007) | Total Number of Years of Available Data (1963-2007) | Years Greater Than 145 Feet (msl) (1963-2007) | Percentage of Years With Greater Than 145 Feet (msl) (1963-2007) |
| July | 39 | 27 | 69.2% |
| August | 41 | 20 | 48.8% |
| September | 41 | 17 | 41.5% |

Id. at 17.

Dr. Overton compared the St. Charles Gauge's available data collected from 1932-1962 with its available data collected from 1963-2007 in order to assess the Corps Projects' culpability. 10/  He calculated the average percentage of days that water stages met or

_____ 10/  Dr. Overton stressed the importance of comparing flood data collected following the construction of the Corps Projects "against the same data collected for time periods prior to the construction of the [Corps Projects] and prior to the management of water flow along the White River and its tributaries by the [Corps]."  Overton Report at 18.  For Dr. Overton, the data collected from 1963 to 2007 captured "the period following the construction of water control facilities on the White River and its tributaries."  Id. at 17.

The justification for Dr. Overton's 1962/1963 demarcation is tenuous.  As discussed above, reservoir-filling for Beaver Dam, the last Corps Project, began in December 1963.  See supra Table 1.  From this, one could infer that dam construction continued until the last month of 1963.  Additionally, although the Corps implemented release-regulation plans for the Corps Projects in 1963, these subsequently were modified in 1966.  See supra Table 2.

Dr. Overton may have dismissed the Beaver Dam's construction dates as irrelevant.  Similar to Table Rock Dam, any releases from Beaver Dam would have flown through Bull Shoals Dam.  See supra note 1.  Reservoir-filling for Bull Shoals Dam finished in March 1953.  See supra Table 1.  Accordingly, Dr. Overton may have predicated his 1962/1963 demarcation on the approximated construction dates of Greers Ferry Dam; indeed, Greers Ferry Dam was the penultimate Corps Project, and its releases are unaffected by Bull Shoals Dam.  See supra note 1.  In March 1962 the Corps began filling the Greers Ferry Dam

exceeded 145 feet (msl) for July, August, and September during these time periods and reported the following:

| Table 4: Average Percentage of Days with Stage Above 145 Feet (msl), July - September | | | |
|---|---|---|---|
| Time Period | Average Percentage of Days Above 145 Feet (msl), July | Average Percentage of Days Above 145 Feet (msl), August | Average Percentage of Days Above 145 Feet (msl), September |
| 1932-1962 | 38.5% | 15.9% | 9.7% |
| 1963-2007 | 47.4% | 29.0% | 17.3% |

_____

10/  (Cont'd from page 11.)

reservoir, which concluded in April 1966.  See supra Table 1.  This may explain Dr. Overton's statement that "[t]he last water control structure was completed in 1966-67." Overton Report at 17-18.

Defendant does not challenge Dr. Overton's 1962/1963 demarcation.  Without controverting data, and in light of the foregoing, the court finds that the 1962/1963 demarcation is reliable, if not explicitly justified.

Id. at 15-19. 11/ From this data Dr. Overton reported that "[t]he amount of time flooding took place prior to the installation of water control facilities on the White River and its tributaries is less than after the facilities were installed and the waters of the system were managed by the [Corps]." Id. at 19. He attributed this increase to the Corps Projects. Absent these projects, "water level fluctuations [above 145 feet (msl)] . . . would be of short duration and would be due to what is generally considered localized summertime thunderstorms." Id. at 20.

The St. Charles Gauge also provided data that Dr. Overton described as having greater significance than average monthly flooding: the sequential years from 1963 until 2007 during which stages exceeded 145 feet (msl) in July, August, and September. See id. at 16 ("One year of flooding is not likely to cause appreciable damage to timber stands[;] however, several years of inundation in sequence will have major negative impacts on the timber resources."). For the month of July, he found five periods of sequential years with stages above 145 feet (msl): 1966-1969; 1973-1976; 1978-1985; 1989-1995; and 1997-2002. See id. For the month of August, he found five periods of sequential years with stages above 145 feet (msl): 1966-1968; 1973-1976; 1982-1983; 1985-1986; and 1990-1995. For the month of September, he found three periods of sequential years with stages above 145 feet (msl): 1966-1967; 1973-1975; and 2002-2003. Additionally, Dr. Overton discovered many periods from 1963-2007 within which individual years experiencing inundation above 145 feet (msl) during July, August, and September were separated by only one non-inundated year. According to Dr. Overton, "[t]his one year reprieve from inundation [was] of little benefit . . . . [because] [t]imber experiencing inundation for several years in sequence will require numerous normal years to recuperate." Id. at 17.

_____

        11/  Dr. Overton also described "March, April, May and June [as] . . . important months of the growing season for bottomland hardwoods." Overton Report at 17. His summary of the St. Charles Gauge's data provided the following comparison of the average percentage of days that water stages met or exceeded 145 feet (msl) for March, April, May, and June:

| Table 5: Average Percentage of Days with Stage Above 145 Feet (msl), March - June | | | | |
|---|---|---|---|---|
| Time Period | March | April | May | June |
| 1932-1962 | 79.6% | 83.6% | 82.4% | 62.0% |
| 1963-2007 | 85.8% | 82.8% | 81.9% | 69.6% |

Id. at 23-24.

13

Dr. Overton concluded that the Corps Projects' water management directly impacted the timber on the George Trust property. He asserted that

> [b]eginning in 1963, the George Estate Trust properties are shown to have been regularly and sequentially flooded during the critical growing season at the property's overbank elevation of 145 feet (msl) as a result of the [Corps's] control of waters within the White River and its tributaries. Numerous time periods, incorporating sequential years, are recorded for the months July through September for the 1963 through 2007 period.

Id. at 21. By creating these adverse conditions, the Corps Projects affected the normal water-drainage characteristics of the George Trust property, which, in turn, exacerbated timber mortality and damaged the regeneration of the property's timber. See id. at 20.

Defendant moves to dismiss for lack of jurisdiction, arguing that plaintiffs' takings claims are time-barred by the six-year statute of limitations applicable to actions filed in the United States Court of Federal Claims, 28 U.S.C. § 2501. Defendant contends that plaintiffs' claims accrued prior to November 26, 2001, the date six years prior to plaintiffs' original complaints. Relying on the declaration of Mr. Schwartz, a geotechnical engineer retained by defendant as an expert, defendant highlights selected language from plaintiffs' two experts—Mr. Blackburn, principal of Blackburn Forestry Services, and Dr. Overton—suggesting that any flooding and damage attributable to the Corps Projects began and spanned over four decades prior to the filing of plaintiffs' complaints. In the alternative, defendant moves for summary judgment on the Stone Trust's claim for failure to set forth a prima facie showing of causation.

Mr. Schwartz states that plaintiffs' properties are located on frequently flooded, poorly drained marsh-swamps. See Schwartz Decl. ¶ 7. Given the absence of a Corps water-control structure on plaintiffs' tributaries, he opines that the "runoff on [plaintiffs' properties] is due to rainfall events coupled with any private water control structures or irrigation." Id. ¶ 6. He asserts that the Georgetown, Arkansas gauging station (the "Georgetown Gauge")—the first gauging station downstream of all six Corps Projects—best measures the performance of all six Corps Projects. 12/ See id. ¶¶ 15-16. After isolating the Corps-caused controlled flow

---

12/ Whereas the St. Charles Gauge's measurements may have best approximated stages at plaintiffs' properties, see Overton Report at 15, the St. Charles Gauge is further downstream from the Georgetown Gauge, see Schwartz Decl. ¶ 15. Because "[t]he closer a river gage is to the source of the controlled flow, the less impact on the gage readings from uncontrolled flow[,] . . . . Georgetown is a better location with respect to uncontrolled

from the natural, uncontrolled flow recorded by the Georgetown Gauge, Mr. Schwartz compared the controlled flow with river-elevation guidelines, or "guide curves." 13/  See id. ¶ 22a.  Based on data collected from 1999 until 2008, controlled flow remained within the lower guide curve from 1999 until 2007; in 2008, barring two days in April, controlled flow remained within the upper guide curve.  Mr. Schwartz also found that the Corps consistently reduced the Corps Projects' controlled flow whenever river stages spiked between May and November.  See id. ¶ 22b. From these discoveries Mr. Schwartz concluded that "any changes in the duration and/or water elevation of floods . . . for the Big Creek Watershed in the vicinity of [plaintiffs' properties] . . . [were] not caused by a change in the operation by the Corps of the six dams within the White River Watershed during . . . 1999 to 2008."  Id. ¶ 23.

As additional support for its motion to dismiss, defendant submits a declaration of H. Henry Himstedt, Chief of the Hydraulics & Technical Services Branch of the Corps's Little Rock, Arkansas District.  The Corps currently operates the Corps Projects in accordance with the Corps's Water Control Master Manual, which last was published in March 1993 and which was supplemented in November 1998 (the "Corps Manual").  See Himstedt Decl. ¶ 3.  Mr. Himstedt asserts that the Corps Projects have been "consistently managed according to the [Corps Manual's guidelines]."  Id. ¶ 5.  Further, since 1998, the Corps Projects have "consistently followed" the seasonal guide curves for the Georgetown Gauge.  Id.

Plaintiffs counter with declarations from Dr. Overton, Mr. Blackburn, and Mr. George, as well as deposition testimony from Mr. Stone.  Dr. Overton emphasizes that "[a]n accurate evaluation of the impacts of the Corp[s] of Engineers (COE) water control activities for the White River cannot be fully accomplished within a mere six year window . . . ."  Declaration of Dr. Jerry Overton, Aug. 27, 2009, ¶ 2.  Rather, the Corps-caused excessive flooding—"continued periodic inundation," id. ¶ 4—alters the timber ecosystem, with less valuable timber replacing the damaged bottomland hardwoods.

This transition has taken place over a period of time beginning with the construction of the water control systems within the 1960s and continuing to

---

12/ (Cont'd from page 14.)

drainage areas than river gages further downstream."  Id.  The Georgetown Gauge is approximately 123 river miles upstream from the intersection of the White River and Big Creek.  See id. ¶ 16.

_____13/ The Corps controls releases from the Corps Projects so that river stage remains in accordance with the guide curves.  See Schwartz Decl. ¶ 14.

the present. This transition will continue until a water control system that does not flood the bottomland hardwoods during consecutive years for the July through September growing season, [sic] is implemented.

Id. ¶ 6. This transition "can only be identified over a long period of time," id., and "can now be identified," id. ¶ 2. Attempting to document the flooding's deleterious effect on the timber ecosystem "within the context of the six year period immediately prior to the filing of the Complaint is not practical." Id. ¶ 8.

According to Dr. Overton, Mr. Schwartz inappropriately focuses on the controlled flow passing the Georgetown Gauge. Although the Georgetown Gauge might accurately measure stage upstream of the plaintiffs' properties, it poorly captures the aggregate controlled and uncontrolled flow—including backflow from the Mississippi River—on the lower portion of the White River. See id. ¶ 5. The periodic flooding suffered by plaintiffs' properties is the result of total river stage, which includes controlled and uncontrolled flow; this flooding is seasonally atypical and is traceable to the Corps Projects' construction. See id. ¶ 6. Agreeing with Mr. Himstedt's assessment of the Corps Projects' consistent operation, Dr. Overton further affirms that the Corps's water management "hasn't deviated substantially for many years prior to 1999," id. ¶ 7, and castigates "[t]he long term impact of this non-deviating policy[,]" id.

Mr. Blackburn responds that defendant misconstrues one of his earlier statements—"I was not able to determine how many years that this stand has been flooded during the growing season," Blackburn Report at 8—and ignores the greater context of his report:

Individual trees that were damaged in the early 1960's are possibly not present in the current stand, and they were probably not present in 2004 [when Mr. Blackburn evaluated the timber]. The inspection of the growth rings of trees currently identified as damaged should show that individual trees that I determined as damaged were not present in the early 1960's. . . . The damage to this stand has been caused by high water conditions that were consistently present over a long period of time. It takes several growing seasons of flooding for the damage in this stand to become so obvious.

Declaration of Sean P. Blackburn, Aug. __, 2009, ¶ 12. He reiterates that "each of the alleged instances of consecutive flooding would have increased [timber] mortality," id. ¶ 10, and declares that "[c]ontinuous and consecutive high water conditions have caused stress,

absence of regeneration, dieback, and individual tree mortality," id. 14/   Morever, defendant's contention that flood damage first arose in the early 1960s is "irrelevant," as "[t]he periodic flooding of this to the present [is] still affecting the development of this stand of timber."  Id. ¶ 5.  According to Mr. Blackburn, defendant ignores that "[t]he effect of flooding . . . at the time of [Mr. Blackburn's] evaluation (2004)."  Id. ¶ 10.

## DISCUSSION

Defendant moves to dismiss plaintiffs' claims due to the bar of the statute of limitations, 28 U.S.C. § 2501, thereby challenging this court's subject matter jurisdiction. In the alternative, defendant moves for summary judgment on the Stone Trust's claim for failure to make a prima facie showing of causation.  Additionally, defendant's final filing argues that "[t]he George Plaintiff's taking claim for crops is without merit," Def.'s Br. filed Sept. 17, 2009, at 2, from which the court infers a motion to dismiss for failure to state a claim upon which relief can be granted.

I.  Defendant's motion to dismiss pursuant to RCFC 12(b)(1)

1.  Standard of review

Jurisdiction must be established before the court may proceed to the merits of a case. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 88-89 (1998).  Courts are presumed to lack subject matter jurisdiction unless it is affirmatively indicated by the record; therefore, it is a plaintiff's responsibility to allege facts sufficient to establish the court's subject matter jurisdiction.  Renne v. Geary, 501 U.S. 312, 316 (1991).  Once the court's subject matter jurisdiction is put into question, it is "incumbent upon [the plaintiff] to come forward with evidence establishing the court's jurisdiction. . . . [The plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence."  Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988); see also McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936) ("If [plaintiff's] allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, [plaintiff] must support them by competent proof.").

---

14/  After examining Dr. Overton's report, Mr. Blackburn notes that "[i]t is therefore obvious that the cycle of flooding identified [during 1966-1969, 1973-1976, 1978-1985, and 1989-1995] . . . consistently removes any regeneration that could have been established during the years when flooding was not a problem."  Blackburn Decl. ¶ 8.

When confronted with a motion to dismiss filed pursuant to RCFC 12(b)(1) and reviewing the sufficiency of a complaint for lack of subject matter jurisdiction, the court's task "is necessarily a limited one," whereby "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982).  When the movant challenges merely the facial sufficiency of the pleadings, the court will accept as true a plaintiff's undisputed allegations of fact, see Scheuer, 416 U.S. at 236, and indulge "all reasonable inferences" in favor of the non-movant, Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995).  Nevertheless, when the RCFC 12(b)(1) motion controverts the plaintiff's jurisdictional allegations and challenges the factual basis of the court's jurisdiction, the plaintiff must demonstrate facts sufficient to support jurisdiction. Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993).  In assessing a plaintiff's proof, the court will not be limited to the allegations of the complaint, but instead "may consider [other] relevant evidence in order to resolve the factual dispute." Reynolds, 846 F.2d at 747; see also Moyer v. United States, 190 F.3d 1314, 1318 (Fed Cir. 1999).

2. Subject matter jurisdiction and sovereign immunity

As a sovereign, "the United States may be sued only to the extent that it has consented to suit by statute, and the terms of that consent define the jurisdiction of the court to hear those suits." Shore v. United States, 9 F.3d 1524, 1525 (Fed. Cir. 1993) (citing United States v. Testan, 424 U.S. 392, 399 (1976)).  Defendant does not challenge plaintiffs' general allegation that subject matter jurisdiction for plaintiffs' Fifth Amendment claims exists under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2006). The Tucker Act "confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States, and . . . waives the Government's sovereign immunity for those actions." Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (citing United States v. Mitchell, 463 U.S. 206, 212-18 (1983)) (en banc); see, e.g., Emery Worldwide Airlines, Inc. v. United States, 49 Fed. Cl. 211, 220 (2001), aff'd, 264 F.3d 1071 (Fed. Cir. 2001). Specifically, the Tucker Act grants jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." § 1491(a)(1).

Defendant challenges the timeliness of plaintiffs' takings claims under the Court of Federal Claims' statute of limitations, 28 U.S.C. § 2501.  Under § 2501 "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." Id.; see also Ingrum v. United States, 560 F.3d 1311, 1314 (Fed. Cir. 2009).  Because consideration of whether

a claim falls within the six-year window of § 2501 implicates the court's subject matter jurisdiction, § 2501 is applied rigidly and cannot be waived. John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 132-35 (2008); see also Young v. United States, 529 F.3d 1380, 1384 (Fed. Cir. 2008). The timeliness of a claim under § 2501 may require *sua sponte* consideration even when it is not challenged. John R. Sand, 552 U.S. at 132.

3. The accrual suspension rule

The accrual of a claim is fixed "when all events have occurred which fix the liability of the Government and entitle [plaintiffs] to institute an action." Brown Park Estates-Fairfield Dev. Co. v. United States, 127 F.3d 1449, 1455 (Fed. Cir. 1997) (quotation omitted). A Fifth Amendment takings claim accrues when the act that constitutes the alleged taking occurs. Ingrum, 560 F.3d at 1314; Goodrich v. United States, 63 Fed. Cl. 477, 480 (2005) (citing Steel Improvement & Forge Co. v. United States, 355 F.2d 627, 631 (Ct. Cl. 1966)). Physical takings occur "'when the government encroaches upon or occupies private land for its own proposed use.'" Goodrich, 63 Fed. Cl. at 480 (quoting Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001)).

The accrual suspension rule suspends the accrual of a claim, "for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed." Young, 529 F.3d at 1384 (quoting Martinez v. United States, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc)) (internal quotation marks omitted); see also Ingrum, 560 F.3d at 1314. The accrual suspension rule is consistent with John R. Sand's strict construction of § 2501 and proscription of equitable tolling. See 552 U.S. at 132-35. As restated in Young, "the accrual suspension rule . . . is distinct from the question whether equitable tolling is available under that statute [§ 2501], although the term 'tolling' is sometimes used in describing the rule." 529 F.3d at 1384 (alteration in original) (quoting Martinez, 333 F.3d at 1319) (internal quotation marks omitted). Nevertheless,

> [t]he accrual suspension rule is strictly and narrowly applied, and the accrual date of a cause of action will be suspended in only two circumstances: [the plaintiff] must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was inherently unknowable at the time the cause of action accrued.

Ingrum, 560 F.3d at 1315 (alteration in original) (internal quotation marks omitted).

Ingrum elaborates upon the "strictly and narrowly applied" accrual suspension rule, holding that "'[w]here the actions of the government are open and notorious . . . [the] plaintiff is on inquiry as to its possible injury,' and the statute of limitations begins to run."

Id. (omission and alteration in original) (quoting Coastal Petroleum Co. v. United States, 228 Ct. Cl. 864, 867 (1981)). Ingrum stands for the reaffirmed principle that landowners are on inquiry of open and notorious government activities on their property regardless of the property's troublesome remoteness or inaccessibility. Id. at 1317; see also Loesch v. United States, 645 F.2d 905, 924-25 (Ct. Cl. 1981) (applying § 2501 to bar plaintiffs' takings claim regarding riverbank erosion, noting that "[i]t is not unreasonable to expect that plaintiffs, as riparian landowners, were familiar to some degree with their riverbanks").

    4.  The timeliness of plaintiffs' takings claims

    According to plaintiffs, "gradual, periodic and intermittent flooding" has damaged their respective timber and the George Trust's crop-land, thereby constituting a taking contrary to the Fifth Amendment. Pls.' Br. filed Sept. 2, 2009, at 3. "[W]hen a taking is caused by a continuous process, it is not complete, for purposes of determining when the claim arose, 'until the situation becomes stabilized.'" Cooper v. United States, 827 F.2d 762, 764 (Fed. Cir. 1987) (quoting United States v. Dickinson, 331 U.S. 745, 749 (1947)). "Stabilization" is an elusive inquiry; not surprisingly, the litigants dispute when the takings of plaintiffs' properties stabilized. The point at which a taking by flood stabilizes may vary by claim, with corresponding causes of action accruing at different times. Therefore, the court analyzes each of plaintiffs' claims in turn. See id.; McDonald v. United States, 37 Fed Cl. 110, 114 (1997), aff'd, 135 F.3d 778 (Fed. Cir. 1998) (unpublished table decision).

    Relying upon Dr. Overton's data and analysis, defendant contends that plaintiffs' timber takings stabilized no later than 1969, after the summer months had flooded consecutively from 1966-1969. In the alternative, the stabilization must have occurred by 1976, at the conclusion of the second iteration of consecutively flooded summer months (1973-1976). Plaintiffs maintain that the situation stabilized and their claims accrued by no earlier than 2004 or 2005, when plaintiffs' representatives "became aware that the resultant damage was caused by the Defendant's actions resulting in the gradual, periodic and recurring flooding affecting Plaintiffs' lands at which time they took action to determine the nature and extent of the taking which had not become clear and were ascertainable until that time." 15/  Pls.' Br. filed Sept. 2, 2009, at 4.

_____

    15/ Plaintiffs misconstrue the deposition testimony of Mr. Stone to represent that "the Stone Trusts reflect that the timber loss became evident and visible in 2005." Pls.' Br. filed Sept. 2, 2009, at 7 (emphasis added). In fact, Mr. Stone testified that "it came to [his] attention six years ago or in 2005 that we had a problem[,]" Stone Dep. at 104 (emphasis added), at which point he noticed that "[t]here are drastically more dead trees out there now," id. at 105. Mr. Stone's awareness of timber loss on his property should not be recast as an objective fact that timber loss previously was not evident and visible.

1)  The stabilization doctrine

The stabilization doctrine first appeared in Dickinson.  See 331 U.S. at 748-49.  The United States Supreme Court considered whether property owners timely filed a Fifth Amendment takings claim against the Government for a flowage easement and erosion attributed to the permanent flooding of West Virginia's Kanawha River by the Winfield Dam.  See id. at 746-47.  The Court affirmed that damages for both the easement and erosion were available—"[w]hen [the Government] takes property by flooding, it takes the land which it permanently floods as well as that which inevitably washes away as a result of that flooding."  Id. at 750; accord United States v. Cress, 243 U.S. 316, 327-28 (1917) ("That overflowing lands by permanent backwater is a direct invasion, amounting to a taking, is settled . . . .").  Nevertheless, because the Government had not fixed the date of its taking by a condemnation proceeding, "[i]t left the taking to physical events, thereby putting on the owner the onus of determining the decisive moment in the process of acquisition by the United States when the fact of a taking could no longer be in controversy."  Dickinson, 331 U.S. at 748.

When a continuous process results in a taking, the Fifth Amendment does not dictate a draconian application of the statute of limitations.  Rather, "procedural rigidities should be avoided."  Id. at 749.  If a claim were to accrue and compel the filing of a complaint as soon as flooding threatens, a landowner would suffer other perils—"for instance, the uncertainty of the damage and the risk of res judicata against recovering later for damage as yet uncertain."  Id.  "[W]hen the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'"  Id.  In these circumstances "there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a [continuous] process by postponing suit until the situation becomes stabilized."  Id.

Dickinson begs the question: when is a continuous process stabilized?  The Court advised that "[a]n owner of land flooded by the Government would not unnaturally postpone bringing a suit against the Government for the flooding until the consequences of inundation have so manifested themselves that a final account may be struck."  Id.  Plaintiffs' claims were not time-barred, as the Court concluded that "the taking which was the basis of these [consolidated] suits was not complete six years prior to [plaintiffs' actions] . . . ."  Id. (emphasis added).  The Winfield Dam began impounding water in 1936, and plaintiffs' property first became submerged by May 30, 1937.  See id. at 747.  Flooding and erosion on plaintiffs' property continued until at least September 22, 1938, when the high-water mark on plaintiffs' property was reached.  See id. at 746.  Thus, the taking continued to manifest

and was not complete until at least September 22, 1938, at which point water levels ceased rising and the situation had stabilized.  Plaintiffs' April 1, 1943 filings were timely.

Three years later, in Columbia Basin Orchard v. United States, 88 F. Supp. 738, 739 (Ct. Cl. 1950), the United States Court of Claims confirmed that stabilization is a factual inquiry regarding the ability to perceive the relative completion of a taking.  The plaintiffs alleged that the Government's construction of Washington's Grand Coulee Dam unleashed a parade of horribles: water pumped from the dam's reservoir flowed to Orchard Lake; Orchard Lake, which was alkaline, overflowed and commingled with plaintiffs' spring between April 16, 1940, and June 15, 1940; plaintiffs' spring, while contaminated with alkaline water, irrigated plaintiffs' orchard; finally, the contaminated water from plaintiffs' spring seriously damaged the orchard's trees.  See id. at 738-39.  Significantly, the court emphasized that Orchard Lake had not overflowed onto plaintiffs' orchard; thus, "[i]f defendant took any of plaintiffs' property, this property was the spring."  Id. at 739.  The taking of their spring entitled the plaintiffs to recover any damage which was a natural consequence of the contamination, and the plaintiffs knew no later than 1941 that their trees had been damaged.  Id.

The plaintiffs in Columbia Basin filed their complaint on May 17, 1948.  Although their spring was contaminated more than six years before they filed, the plaintiffs argued that Dickinson "held that it was not necessary for a landowner to begin his action as soon as the act has been done which made damage to one's property imminent, but that the owner had the right to wait until the extent of the damage had been ascertained."  Id.  Disagreeing, the Court of Claims analyzed stabilization as a factual inquiry regarding the extent of the taking, not the damages attributable to the taking; accordingly, plaintiffs' claim accrued with the contamination of the spring between April 16, 1940, and June 15, 1940.  See id. ("[W]e do not think the Supreme Court, in the Dickinson case, meant to hold that plaintiff[s] [were] entitled to wait until any possibility of further damage had been removed.").  Not only had the plaintiffs filed their complaint "more than six years after the defendant had done the act of which the plaintiff[s] complain[], [but also] more than six years after plaintiff[s] knew that [their] trees had been damaged to such an extent that it was unprofitable to undertake to produce a crop."  Id.  Plaintiffs' claim was time-barred by any measure.

Subsequent cases—many dissimilar to Dickinson and the instant matters—discussed the potential scope of Dickinson.  In United States v. Dow, 357 U.S. 17, 18-19 (1958), the Supreme Court considered the accrual of a claim for the taking of property for a right-of-way to lay pipe.  Discussing Dickinson the Court stated that "[t]he expressly limited holding in Dickinson was that the statute of limitations did not bar an action under the Tucker Act for a taking by flooding when it was uncertain at what stage in the flooding operation the land had become appropriated to public use."  Id. at 27 (emphasis added); see also Kabua v.

22

<u>United States</u>, 546 F.2d 381, 384 (Ct. Cl. 1976) ("[<u>Dow</u>] more or less limited [<u>Dickinson</u>] to the class of flooding cases to which it belonged, when the landowner must wait in asserting his claim, until he knows whether the subjection to flooding is so substantial and frequent as to constitute a taking."); <u>Hilkovsky v. United States</u>, 504 F.2d 1112, 1114 (Ct. Cl. 1974) ("[<u>Dow</u>] distinguished the flooding situation in <u>Dickinson</u> from other types of Government taking because, in the slow flooding situation in <u>Dickinson</u>, the full extent of the Government taking could not be known until the high water mark of the flooding had been reached."). In <u>Gustine Land & Cattle Co. v. United States</u>, 174 Ct. Cl. 556, 656 (1966), the Court of Claims advised against an open-ended interpretation of § 2501 that "would put the <u>Dickinson</u> doctrine in unending conflict with the statute of limitations[,]" which "was never the purpose of the decision." <u>16</u>/

The facts of <u>Barnes v. United States</u>, 538 F.2d 865, 868 (Ct. Cl. 1976), more resemble the instant cases. In <u>Barnes</u> the plaintiffs were landowners of riparian and nonriparian lands at the confluence of the Missouri and Niobrara Rivers in Nebraska. <u>Id.</u> The plaintiffs showed that releases from the Fort Randall Dam on the Missouri River, beginning in 1969, had created recurrent out-of-season high water that flooded plaintiffs' properties and impeded surface and subsurface drainage. <u>See id.</u> at 869. From 1969 until 1973, and again in 1975, intermittent, inevitably recurring flooding occasioned a taking of plaintiffs' land,

---

<u>16</u>/  Dicta in <u>Fallini v. United States</u>, 56 F.3d 1378, 1380 (Fed. Cir. 1995), recall <u>Gustine</u>. Factually dissimilar to the instant matters, <u>Fallini</u> involved the alleged taking of private property by federal statutes providing for the protection of wild horses and burros on public land. <u>Id.</u> at 1379-80 (discussing the Wild Free-Roaming Horses and Burros Act, 16 U.S.C. §§ 1331-40 (1988) (the "Horse and Burro Act")). The plaintiffs alleged that the Horse and Burro Act prohibited the construction of a fence that would have excluded wild horses from a water source on their property; because the wild horses drank water from plaintiffs' property, each lap of water effected a continuous taking. <u>See id.</u> at 1380-81. The plaintiffs proposed—and the Federal Circuit rejected—an unfounded and apparently self-serving date of stabilization upon which to base claim accrual and trigger the statute of limitations. <u>See id.</u> at 1382. In dicta the court foreswore interpreting <u>Dickinson</u> to postpone stabilization until all damages due to a taking can be calculated. <u>Id.</u> at 1381. "That interpretation of the <u>Dickinson</u> rule . . . would mean that in a case such as this one, where the damages continue to increase over time, the plaintiffs' cause of action would never accrue and the statute of limitations would never run." <u>Id.</u>

Defendant relies upon <u>Fallini</u> for the unrelated proposition that accrual is "determined under an objective standard; a plaintiff does not have to possess actual knowledge of all relevant facts in order for the cause of action to accrue." 56 F.3d at 1380.

crops, and a flowing easement appurtenant.  See id. at 872; accord Cress, 243 U.S. at 328
("There is no difference of kind, but only of degree, between a permanent condition of
continual overflow by backwater and a permanent liability to intermittent but inevitably
recurring overflows; and, on principle, the right to compensation must arise in the one case
as in the other.").  Defendant contended that plaintiffs' takings claims accrued in 1969, the
first year of flooding.  The plaintiffs countered that their claims accrued in 1973, when it first
"could be said with relative certainty that the flooding would be permanent." Barnes, 538
F.2d at 873.  The Court of Claims cited Dickinson and observed that "[a]dopting a date of
taking must often be done in a somewhat imprecise manner[.] . . . The date selected
obviously depends on the facts of each case . . . ." Id. (citation omitted).  The court
concluded that "the date of taking here is not in our view the date of the first flood in 1969,
but rather in 1973 when it first became clearly apparent by the passage of time that the
intermittent flooding was of a permanent nature." Id.

Defendant cites Cooper, 827 F.2d at 764, the outcome of which was dependent on the
stabilization of a takings claim for flood-damaged timber.  In 1979 the Government's
construction of the Tennessee-Tombigbee Waterway blocked a fork of the Tombigbee River
that was adjacent to plaintiff's farm.  See id. at 762.  "The blockage caused unusual flooding
of a two hundred acre section of the bottom land of [plaintiff's] farm." Id.  From 1979 until
the removal of the blockage in 1984, the timber on the flooded land died at an exponential
rate.  The United States Court of Appeals for the Federal Circuit summarized that

> [a]s of the end of 1979, the number of dead trees, scattered throughout the
> approximately two hundred acres of timber land, covered the equivalent of
> approximately two acres of dead trees [1% of the flooded land].  By August
> 20, 1980, approximately ten percent of the trees in the timbered area were
> dead, and more than fifty percent of the trees in the area were damaged.  By
> September 2, 1984, the dead timber represented the equivalent of
> approximately seventy-five acres of dead trees [37.5% of the flooded land].
> If the clogged condition of the river had continued after 1984, further damage
> to and destruction of timber in the bottom land would have continued after
> 1984.

Id. at 762-63.

In Cooper the Federal Circuit distinguished Dickinson's stabilization doctrine:

In Dickinson, the critical question was: when did the flooding become
sufficiently stabilized so that the property owner could determine what land
was taken by the flowage easement? In this case, the critical question is: when

did the destruction of trees become sufficiently stabilized so that the owner
could determine the amount of timber taken?

Id. at 764.  The point of accrual differs because, "[a]lthough the operative force, flood water,
was the same in both cases, it operates differently, and at different times, to cause a taking
of land by inundation, or a taking of timber by suffocation."  Id.  In the latter situation, the
destruction and concomitant taking of timber by flooding, the identifiable completeness of
the destruction of the trees determines the extent of the taking and, hence, the moment of
stabilization.  In Cooper, although the trees on plaintiff's property began to die in 1979, "the
extent of the destruction was not ascertainable until 1984, when [plaintiff] filed suit."  Id.

       More recent than Cooper, Applegate v. United States, 25 F.3d 1579, 1582-83 (Fed.
Cir. 1994), also is relevant to the resolution of the instant matters.  In Applegate a class of
plaintiffs filed suit on December 4, 1992, alleging that the Corps's construction of jetties on
the east coast of Florida caused the erosion of their beachfront properties.  See id. at 1581.
Despite approximately forty years of erosion preceding its filing, plaintiffs' complaint was
not time-barred.  The jetty-caused erosion began in 1952; for decades subsequent, however,
the Corps promised to build a sand-transfer plant to halt and reverse the continuous erosion.
With an operational sand-transfer plant, plaintiffs' properties would have suffered little, if
any, permanent damage.  Id. at 1582.  The Federal Circuit clarified that

       [i]n both Dickinson and Cooper, stabilization of the taking situation depended
       on the seasonal cresting or receding of flood waters.  In this case, however, the
       continuous physical taking is very gradual.  The shoreline is slowly receding
       over a period of years.  Moreover, the almost imperceptible physical process
       has delayed detection of the full extent of the destruction—a necessary
       precondition of striking a final account.

Id.  As significant as the inconspicuous nature of the erosion were the Corps's assurances that
it would reverse the erosion.  The pending sand-transfer plant ensured that the plaintiffs had
"no way to determine the extent, if any, of the permanent physical occupation."  Id.
Therefore, "due to both the very gradual nature of this particular continuous physical process
and the Corps' promises to restore the . . . sand, this taking had not stabilized by 1986—six
years before the landowners filed suit."  Id. at 1583.

       Discussing Applegate, Boling v. United States, 220 F.3d 1365, 1372 (Fed. Cir. 2000),
reiterated "that it is the uncertainty surrounding the permanent nature of the taking, and not
the uncertainty surrounding the ultimate extent of the erosion damage, that is critical in
determining whether the situation has stabilized."  As in Applegate, the Boling plaintiffs
alleged that the "slow and irregular nature of erosion and the difficulty in determining the

exact location of the government's easement led to great uncertainty in determining when erosion first affected their property." Id. at 1371. The Federal Circuit held that plaintiffs' claims "accrued when the erosion had substantially encroached the parcels at issue and the damages were reasonably foreseeable." Id. at 1373.

Defendant analogizes the instant matters to Nadler Foundry & Machine Co. v. United States, 164 F. Supp. 249, 251-52 (Ct. Cl. 1958). The plaintiff acquired property fronting a Louisiana ship canal in 1919. See id. at 250. The Corps had dredged the canal since 1905, removing lateral support to plaintiff's property. Between 1926 and 1934, as dredging continued, the lower level of plaintiff's canal-front property crumbled into the bayou. After an extensive cave-in of the upper level of plaintiff's land in 1934, the plaintiff unsuccessfully attempted to forestall further property resorption. Despite plaintiff's efforts the upper level continued to deteriorate until the plaintiff built a protective bulkhead in 1951. See id. at 250-51. The plaintiff filed its takings claim on October 1, 1954, arguing that, under Dickinson, its claim had not accrued until six years before that date. See id. at 251. The Court of Claims disagreed, determining that "when, before 1934, the water had practically reached the bottom of the steep bank sloping up to the upper level land, the ultimate cave-in of that land was a foreseeable future event." Id. Plaintiff's unsuccessful mitigation of the erosion after the 1934 upper level cave-in revealed its understanding of the situation. Accordingly,

> [t]he very same suit, on the same grounds and for the same damages, could have been brought by the plaintiff at least as long ago as 1934. If it had been brought at that time, questions of fact the solution of which is difficult on the present record would or might have been easier to solve. The purpose as well as the period of the statute of limitations argue against the plaintiff.

Id.

In contrast to Nadler, the other precedents discussed above provide more instructive guidance for determining the point of stabilization for the alleged timber takings. As in Cooper the operative inquiry is "when did the destruction of trees become sufficiently stabilized so that the owner could determine the amount of timber taken?" 827 F.2d at 764. Although not controlling, the stabilization doctrine as applied in precedents unrelated to a taking by suffocation—including Dickinson and other flowage-easement case law—are persuasive. See id. at 763 ("[T]his case is not controlled by the cases cited by the trial court dealing with flowage easements."). Consequently, while analyzing the particular facts presented by plaintiffs' claims, the court heeds the cautious approach of the Court of Claims and the Federal Circuit to finding stabilization: it should not be too late, thus perpetually tolling the statute of limitations, see, e.g., Gustine, 174 Ct. Cl. at 656; Nadler, 164 F. Supp.

at 251, nor too early, before damage due to flooding assumes a certain, permanent nature, see, e.g., Boling, 220 F.3d at 1372; Applegate, 25 F.3d at 1582-83; Barnes, 538 F.2d at 873.

2) Plaintiffs' timber claims

In light of the foregoing, the predicate taking to the George Trust's timber claim stabilized no later than 1976. Its claim then accrued and now is untimely under § 2501. Dr. Overton, plaintiffs' hydrology expert, took the historical records of flood conditions on plaintiffs' properties and analyzed the juxtaposition of data recorded from 1932-1962 with data recorded from 1963-2007. Dr. Overton stated that the 1962/1963 demarcation captured the Corps Projects' impact. Despite the fact that Dr. Overton might have selected another date from within that decade, the court accepts the 1962/1963 demarcation as plaintiffs' unchallenged factual allegation and as an accurate point from which to evaluate the Corps Projects. See supra note 10.

Dr. Overton's conclusions are revelatory. From July through September, the critical portion of the growing season and historically within the dry season for their properties, plaintiffs' properties suffered flood conditions more often after the Corps Projects' construction. 17/ See Overton Report at 19 (calculating 8.9% more often in July, 13.1% more often in August, and 7.6% more often in September). Dr. Overton also found multiple periods in which flooding during July, August, and September, respectively, spanned sequential years. The first such period was in the 1960s, with sequential years of flooding from 1966-1969 for July; from 1966-1968 for August; and from 1966-1967 for September. The second was in the 1970s, with sequential years of flooding from 1973-1976 for July; from 1973-1976 for August; and from 1973-1975 for September. 18/ These conditions were

_____

17/ Plaintiffs' properties may have suffered from post-Corps Projects flooding more often than suggested by Dr. Overton. He used measurements of 145 feet (msl) to extrapolate conclusions of flooding conditions and damage. Nevertheless, measurements of 145 feet (msl) conservatively depict flood conditions and damage because measurements of 142 feet (msl) would allow for the consideration of lingering subsurface soil saturation impacting timber root systems. See supra note 9.

_____

18/ In sum:

Beginning in 1963, the George Estate Trust properties are shown to have been regularly and sequentially flooded during the critical growing season at the property's overbank elevation of 145 feet (msl) as a result of the [Corps's] control of waters within the White River and its tributaries. Numerous time periods, incorporating sequential years, are recorded for the months July through September for the 1963 through 2007 period.

Overton Report at 21.

highly destructive to the timber on plaintiffs' properties, as consecutive years of inundation during the critical growing season resulted in timber mortality and minimal regeneration. 19/ See id. at 20.

Mr. Blackburn, plaintiff's timber expert, substantiates Dr. Overton's conclusions regarding flood-damaged timber.  In the Blackburn Report, Mr. Blackburn described "a very degraded forest due to excessive flooding," Blackburn Report at 2, with the majority of the timber stand affected by "[timber] mortality, degradation of the quality of wood products, reduction of normal growth rates, and . . . [the] hindered . . . establishment of natural bottomland hardwood regeneration," id. at 8 ("This stand will continue to degrade if flooding persists, but the damage has already been done on the majority of the stand." (emphasis added)).  Mr. Blackburn blamed this timber damage on "continuous flooding during the growing season," id. at 2, as Blackburn Forestry Services "was not able to determine how many years that this stand has been flooded during the growing season," id. at 8.  Taken together, the expert analyses of Dr. Overton and Mr. Blackburn reveal that the periodic, unnatural flooding which began in 1963 had an immediate effect on the timber on plaintiffs' properties; as flooding persisted, its pernicious effects continued to fester, contributing to the aggravated condition—the timber ecosystem transition—now existent on plaintiffs' properties.

Dr. Overton's supplemental declaration validates the court's finding that the George Trust's timber taking stabilized no later than in 1976.  Dr. Overton indicates that the transition to a less valuable timber ecosystem "can only be identified over a long period of time," Overton Decl. ¶ 6, and "can now be identified," id. ¶ 2.  Nevertheless, ecosystem transition is not a proper measure of the flood-related damage to the existent timber stand; instead, ecosystem transition is a description of the proliferation of less valuable timber species (the long-term consequence of earlier timber damage). 20/  The transition to a less valuable timber ecosystem might not have been identifiable previously, but timber damage to the existent stand was.  The implication of Dr. Overton's report is that heightened timber mortality and depressed regeneration began soon after flood conditions changed in 1963.  By

_____

19/   Again, Dr. Overton's conclusions understate the post-Corps Projects flood conditions and damage on plaintiffs' properties.  Numerous nonsequentially flooded growing seasons were separated by only one dry year, a reprieve providing little benefit to timber mortality and regeneration.  Overton Report at 17.  Further, plaintiffs' properties likely flooded before stage reached 145 feet (msl).  See id. at 15.

20/  Criticizing earlier studies by the Corps, Dr. Overton argued that the timber stand had changed, with more valuable timber species replaced by less valuable, flood-tolerant species.  See supra note 7.

the second iteration of sequential years of inundated growing months, this damage was certain, identifiable, and destined for repetition during future flood cycles. See Barnes, 538 F.2d at 873 (finding stabilization after second year of flooding, which revealed permanent nature of flooding). Dr. Overton's advice that the timber transition perpetually will continue while the Corps Projects' water management remains unchanged "would mean that in a case such as this one, where the damages continue to increase over time, the plaintiffs' cause of action would never accrue and the statute of limitations would never run." Fallini v. United States, 56 F.3d 1378, 1381 (Fed. Cir. 1995).

Likewise, Mr. Blackburn's declaration suggests that he confuses long-term ecosystem transition with the appropriate answer to the instant matters' critical question: "[W]hen did the destruction of trees become sufficiently stabilized so that the owner could determine the amount of timber taken?" Cooper, 827 F.2d at 764. Mr. Blackburn describes the cyclical nature of timber damage on plaintiffs' properties:

> Individual trees that were damaged in the early 1960's are possibly not present in the current stand, and they were probably not present in 2004 [when Mr. Blackburn evaluated the timber]. The inspection of the growth rings of trees currently identified as damaged should show that individual trees that I determined as damaged were not present in the early 1960's. . . . The damage to this stand has been caused by high water conditions that were consistently present over a long period of time. It takes several growing seasons of flooding for the damage in this stand to become so obvious.

Blackburn Decl. ¶ 12. Restated, timber began to die in the 1960s, and any new trees that grew during non-flooded intervals would have died in subsequently flooded periods. This was a predictable pattern, and plaintiffs offer no evidence to suggest that varying Corps water-control practices led to unpredictable timber damage; rather, plaintiffs' expert agrees that the Corps Projects consistently have operated for many years prior to plaintiffs' claims. See Overton Decl. ¶ 7.

Accordingly, the extent of timber taken became apparent by 1976; if not by 1976, it should have been apparent after sequential flooding periods from 1978-1985 or 1989-1995, "a cycle of flooding . . . [which] consistently remove[d] any regeneration that could have been established during the years when flooding was not a problem." Blackburn Decl. ¶ 8. Such flood cycles revealed interim timber recovery to be ephemeral and demonstrated the permanent nature of plaintiffs' timber damage. As does Dr. Overton, Mr. Blackburn incorrectly judges plaintiffs' timber claims as timely by focusing on the timber transition *in toto*; indeed, he justifies his conclusions by arguing that defendant ignores the "effect of flooding . . . [on] the stand at the time of [his] evaluation (2004)." Id. ¶ 10. Nevertheless,

by predicating his conclusions on the fact that "[t]he periodic flooding . . . [is] still affecting the development of this stand of timber," id. ¶ 5, Mr. Blackburn also "put[s] the Dickinson doctrine in unending conflict with the statute of limitations," Gustine, 174 Ct. Cl. at 656. Plaintiffs' insistence that their timber claims are timely is not based on when timber damage actually occurred, but rather on the related but irrelevant (for purposes of determining stabilization and accrual) long-term transition of the ecosystem—the growth of less valuable timber species, the insignificant timber regeneration, and the reduction of normal growth rates. 21/

The analyses from plaintiffs' experts confirm that the taking of the George Trust's timber stabilized no later than 1976. Mr. George's declaration cannot overcome plaintiffs' own expert analyses to satisfy plaintiffs' burden to establish this court's subject matter jurisdiction by a preponderance of the evidence. See Reynolds, 846 F.2d at 748. Regarding the George Trust's timber, Mr. George declares that the "George Family Trust was not aware of the nature and extent nor cause of the damage to its timber prior to the Blackburn Report [in 2004]." George Decl. ¶ 9. To the contrary, however, plaintiffs' experts have shown that, although the transition to less valuable timber stand now is more developed, the timber's damage was existent, certain, and detectable by 1976. 22/ The damage did not imperceptibly or inconspicuously evolve. See Applegate, 25 F.3d at 1582 (finding that an "imperceptible

_____

21/ The facts at bar are distinguishable from those in McDonald, 37 Fed. Cl. at 112-13, in which a similar claim for a taking of timber was not time-barred. In McDonald the Government admitted that although flood levels had stabilized by 1983, the "trees on plaintiffs' properties would not have immediately died [in 1983] but would first have become stressed." Id. at 117 (emphasis added). Timber stress might not have manifested into visible timber damage until at least February 17, 1986, within the six-year statute of limitations applicable to plaintiffs' complaint. Id. at 118. In contrast, in the instant matters, although a transition to less valuable timber stand might not have been apparent, the extent of damage to plaintiffs' existent timber was certain and ascertainable by no later than 1976.

_____

22/ The Corps's internal communications suggest that timber damage would have been certain and ascertainable, as well, stating that following summer flooding:

> 1) The entire year of tree growth and germination is lost. 2) Trees intolerant of prolonged flooding . . . become quickly stressed and suffer considerable mortality. 3) Typically the larger trees . . . are the first to experience stress and mortality. 4) Herbaceous ground cover and regeneration of flood intolerant timber types is oftentimes almost totally absent.

Overton Report at 11 (emphasis added).

physical process . . . delayed detection"). The George Trust—particularly Mr. George, having lived on the property for approximately fifty years—is on inquiry of such open and notorious activity by the Corps and the damage attributable thereto. See Ingrum, 560 F.3d at 1317; cf. Fallini, 56 F.3d at 1380 ("The question whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue."). Accordingly, the George Trust's claim for a taking of timber accrued by 1976 and now is time-barred.

The conclusion that the Stone Trust's timber claim also is time-barred necessarily follows. Plaintiffs' properties are proximate and comparable, and flooding and timber damage on the George Trust property similarly would have appeared on the Stone Trust properties. See McDonald, 37 Fed. Cl. at 116 ("[T]he court is satisfied that any stress visible on the timber located on plaintiffs Crawford's property also would have been visible on the timber located on plaintiff McDonald's property due to the close proximity of the parcels to each other, and the similar geographic conditions of each." (internal quotation omitted)). Although Mr. Stone subjectively became aware of flood-damaged timber "six years ago or in 2005," Stone Dep. at 104, for the reasons discussed above, accrual is judged objectively, and Mr. Stone and the Stone Trust were on inquiry of the established timber damage. 23/ Moreover, the conclusions of Mr. Stone's forester, Mr. Berry, mirror the jurisdictionally insufficient conclusions of Dr. Overton and Mr. Blackburn. Rather than specifying any newly ascertainable timber damage, Mr. Berry unspecifically advanced that "[a] lack of regeneration and mortality in the tops makes it clear that there has been damage done by water standing on the timber during the growing season." Def.'s Br. filed June 29, 2009, Ex. B to Declaration of Frank J. Singer, June 29, 2009.

_____

23/ The only other evidence that might establish the timeliness of the Stone Trust's timber claim is the testimony of Mr. Stone, who acquired his property in 2000, that seasonal flood patterns had changed since 2000, resulting in greater flooding from April through September. Stone Dep. at 108-11. Still, Mr. Stone could not recall specific dates of flooding, nor does his deposition testimony suggest any newly established or ascertainable timber damage that might have been occasioned by changing flood patterns—particularly timber damage after November 26, 2001, six years prior to the filing of plaintiffs' complaints. See id. Mr. Stone's testimony is not consistent with Dr. Stone's in acknowledging the historical flooding of the Stone Trust properties during the growing season prior to 2000; Dr. Stone could not recall whether flooding more frequently occurred since 2000. Dr. Stone Dep. at 14-15, 20. This inconsistent evidence does not preponderate in the Stone Trust's favor.

3)  The George Trust's crop-land claim

The court separately considers the stabilization and timeliness of the George Trust's crop-land claim.  The George Trust alleges that the "inevitably recurring flooding over the [George Trust's] farm lands during growing seasons of crops have [sic] rendered some 65 acres of [the George Trust's] land unusable as crop lands . . . ."  George Trust Am. Compl. ¶ 9. Defendant contends that the crop-land claim must have accrued before 1999, relying on Dr. Overton's report—which shows increased flooding after 1962—and the consistent operation of the Corps Projects from 1999 through 2008.  See Def.'s Br. filed June 29, 2009, at 9. Regarding the latter, defendant's expert, Mr. Schwartz, declares that the Corps Projects have operated without significant variation from 1999 through 2008.  See Schwartz Decl. ¶ 22; see also Overton Decl. ¶ 7 (agreeing with Mr. Schwartz and stating that the Corps's water management "hasn't deviated substantially for many years prior to 1999").  Controlled flow emanating from the Corps Projects, with some exceptions, consistently remained within the allotted guide curves.  See Schwartz Decl. ¶ 22.  From this data Mr. Schwartz concludes that any changes in the duration of or water levels resulting from flooding from 1999 through 2008 were not caused by the Corps Projects.  See id. ¶ 23.  From Mr. Schwartz's conclusion, defendant extrapolates that a claim for a taking of crop-land must have accrued before 1999. See Def.'s Br. filed June 29, 2009, at 9 (citing McDonald, 37 Fed. Cl. at 116-17 (holding that taking of crops accrues when flood waters stabilize)).

The George Trust responds that, notwithstanding the Corps's consistent water-control policy, the cumulative stage occasioned by controlled and uncontrolled flow has impacted plaintiffs' properties.  Further, the George Trust seems to argue that the crop-land taking stabilized in 2003 and directs the court's attention to Mr. George's declaration, which asserts:

> 6.  With respect to the periodic flooding, the pattern of flooding began to change particularly with respect to the cultivated land which is subject to the Plaintiff George Family Trust's Complaint for damages in 2003 when portions of the same began to remain inundated during the planting seasons up through early summer making utilization of the crop lands impossible.

> 7.  Prior to the 2003 crop year the farm tenant who rented the cultivated land was able to plant and harvest crops on now inundated lands without loss to the Plaintiff.

George Decl. ¶¶ 6-7.  Based on this declaration, the George Trust contends that the George Trust's "crop losses were not sustained until 2003 and subsequent years to the present. Clearly the crop loss accrued within the six year statute of limitations in light [sic] the first year loss [sic] occurred in 2003."  Pls.' Br. filed Sept. 2, 2009, at 6.

32

Plaintiffs' filings are imprecise.  Language therein alternatively suggests a taking of crop-land by inundation or a taking of crop yields in 2003.  Compare George Trust Am. Compl. ¶¶ 9, 14 (stating that "inevitably recurring flooding over the [George Trust's] farm lands during growing seasons of crops have [sic] rendered some 65 acres of [the George Trust's] land unusable as crop lands," and requesting damages for a taking of "cropland [sic]"), and George Decl. ¶¶ 6-7 (describing inundated crop-land), with Pls.' Br. filed Sept. 2, 2009, at 4 ("[T]he George Family Trust seeks compensation for taking of both timber and crops."), and Pls.' Br. filed Sept. 2, 2009, at 6 ("The attached George Declaration . . . states that its crop losses were not sustained until 2003 . . . .").  Still, notwithstanding this ambiguity, the underlying allegation is that flooding of a periodic or permanent nature has rendered the George Trust's crop-land unusable—a taking of crop-land by inundation, a claim necessitating a different analysis than plaintiffs' timber takings.  See McDonald, 37 Fed. Cl. at 115 ("It is clear from their complaints that plaintiffs are alleging the taking of flowage easements relating to their claims for fair market value loss of their lands.  Their claims for the loss of timber, however, are not necessarily predicated on the taking of flowage easements.  Although the timber at issue was standing on the land for which plaintiffs seek to show a reduction in fair market value, plaintiffs' timber-related claims represent separate causes of action within the meaning of [Cooper, 827 F.2d at 764].").

With respect to this claim, the George Trust carries its burden to establish the court's subject matter jurisdiction, as the predicate taking to the George Trust's crop-land claim likely stabilized in 2003.  In a taking by inundation, the court must identify "when the flooding [became] sufficiently stabilized so that the property owner could determine what land was taken."  Cooper, 827 F.2d at 764.  Although the flooding of plaintiffs' timber already had stabilized, the high-water mark reached on the George Trust's crop-land was not certain or attained until 2003. 24/  George Decl. ¶ 6 (explaining that, in 2003, "the pattern of flooding began to change particularly with respect to the cultivated land" (emphasis added)).  See Dickinson, 331 U.S. at 749; Hilkovsky, 504 F.2d at 1114 (discussing Dow, 357 U.S. at 18-19, and stating that Dickinson forestalls stabilization "until the high water mark of the flooding had been reached").  That timber loss by suffocation may have been identifiable and stabilized by 1976 does not vitiate the evidence establishing the later stabilization of a crop-land taking.  See Cooper, 827 F.2d at 764 ("The point at which a taking becomes sufficiently certain to give rise to a claim for compensation varies in each

_____

24/  Mr. George also states that the crop-land became unusually inundated during the planting season of the "early summer" months, not the growing season of July through September.  George Decl. ¶ 6.  This may suggest a new pattern of flooding, as in 1986 the Corps recognized that, "[b]y early summer, water levels have historically receded to within banks."  Overton Report at 10.

case."). Indeed, although defendant disputes the Corps's responsibility for varying post-1999 flood conditions, defendant does not contend that crop-land inundation identified in 2003 previously was existent or evident. Accordingly, Mr. George's declaration sufficiently establishes the inundation of crop-land in 2003 as a new consequence for which a final account theretofore could not be struck. See Dickinson, 331 U.S. at 749 ("An owner of land flooded by the Government would not unnaturally postpone bringing a suit against the Government for the flooding until the consequences of the inundation have so manifested themselves that a final account may be struck.").

The same conclusion would result were the court to apply a foreseeability standard. See McDonald, 37 Fed. Cl. at 117 (finding crop-land takings claim time-barred, and stating "[t]he same conclusion results if the court applies the foreseeability standard to determine the date of accrual of [plaintiff's] cause of action"). In Nadler the cave-in of the upper level of plaintiff's property was ineluctable and foreseeable based on the apparent pattern of erosion of the lower level. See 164 F. Supp. at 251; see also Boling, 220 F.3d at 1373 (finding stabilization of erosion when "damages were reasonably foreseeable"). Here, notwithstanding the stabilization of flooding with respect to plaintiffs' timber, the inundation of the George Trust's crop-land was not foreseeable. Mr. George's declaration sufficiently implies that periodic flooding patterns unpredictably changed in 2003, thereby impacting what previously had been a viable agricultural enterprise despite historical flooding.

II. Defendant's motion to dismiss pursuant to RCFC 12(b)(6)

The court understands that defendant has put forth a motion to dismiss the George Trust's crop-land claim pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. Defendant contends that this claim is without merit, as "the George Plaintiff does not—indeed cannot—establish that this 2003 flooding was a result of the Corps' operation of the dams." Def.'s Br. filed Sept. 17, 2009, at 2. Rather, flood-damaged crop-land is a consequence of uncontrolled flow, or "fluctuations in flow that the Corps does not regulate," id. at 3 (emphasis in original), for which the Corps is not liable.

1. Standard of review

RCFC 12(b)(6) allows "the court to eliminate actions that are fatally flawed in their legal premises and destined to fail." Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 988 F.2d 1157, 1160 (Fed. Cir. 1993); see also Neitzke v. Williams, 490 U.S. 319, 326-27 (1989). The court's task is not to determine whether a plaintiff will ultimately prevail, but "'whether the claimant is entitled to offer evidence to support the claims.'" Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2007) (quoting Scheuer, 416 U.S. at 236). The court must assess whether a complaint adequately

states a claim and whether a plaintiff can allege facts "plausibly suggesting (not merely consistent with)" a showing of entitlement to relief.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007); Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (restating Twombly standard as stating "a claim to relief that is plausible on its face"); McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1356-57 (Fed. Cir. 2007).

Although a plaintiff's factual allegations need not be "detailed," they "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Twombly, 550 U.S. at 555 (internal citation omitted).  The court thus "'accept[s] as true all factual allegations in the complaint, and . . . indulge[s] all reasonable inferences in favor of the non-movant'" to evaluate whether plaintiffs have stated a claim upon which relief can be granted.  Chapman Law Firm, 490 F.3d at 938 (quoting Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (omission in original)).

2. Sufficiency of the claim

The court recognizes that "[t]he United States is not liable for flood damages unless directly attributable to governmental action.  Indirect or consequential damages are not compensable."  Bartz v. United States, 633 F.2d 571, 577 (Ct. Cl. 1980); see also Columbia Basin Orchard v. United States, 132 F. Supp. 707, 709 (Ct. Cl. 1955) ("To constitute a taking, the overflow of or seepage into the spring must have been the direct, natural or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.").  In Bartz the Court of Claims considered an inverse condemnation action brought by riparian landowners on the Iowa River. 633 F.2d at 572.  The landowners complained of impacted crops due to greater flooding and subsurface saturation following the construction of the Coralville Dam and its reservoir.  See id. at 573.  The Corps was not liable, however, as the court concluded that "excessive precipitation was the root cause of the flooding experienced by plaintiffs in the wet years of which they complain."  Id. at 577 (explaining that "[t]he government's manipulation of releases from the dam played only a secondary role").

Defendant revels in the declaration of Dr. Overton, the George Trust's hydrology expert, reciting:

The [Corps's] expert report [prepared by Mr. Schwartz] does a good job of documenting that the [Corps's water-control] policy has not substantially deviated since 1999. *Actually, it hasn't deviated substantially for many years prior to 1999.*  This lack of consideration of the impact of this policy within

the context of natural, *that is uncontrolled by the [Corps's] flow*, with the flow generated by the release of water during the prime growing season in consecutive years, has lead [sic] to the destruction of valuable bottomland hardwood timber stands, and their replacement by less desirable and valuable species of vegetation.

Def.'s Br. filed Sept. 17, 2009, at 3 (emphasis in original) (quoting Overton Decl. ¶ 7). Ignored by defendant, however, is the implication that the Corps's policy for controlled flow "within the context of" uncontrolled flow has occasioned the flooding of plaintiffs' properties. Overton Decl. ¶ 7 (emphasis added). Dr. Overton's declaration clarifies the conclusion to be drawn from his expert report regarding the source of flooding: uncontrolled flow alone is not to blame, but rather "[t]he combination of controlled flow . . . and uncontrolled flow downstream of the Georgetown gauging station[,] as well as backflow resulting from varying levels of the Mississippi River, result[ing] in unnatural flooding of the George Family Trust properties." 25/ Id. (emphasis added).

_____

        25/   Out-of-context, excerpted statements from Dr. Overton's rebuttal of Mr. Schwartz's analysis of the Corps Projects' water-control might suggest that Dr. Overton primarily blames uncontrolled flow for flooding:

        Mr. Schwartz is stating that the impact of uncontrolled, that is flow that does not come through one of the [Corps Projects], does not play a role in water control decisions for the White River.

        [Mr.] Schwartz goes to great lengths to separate the flow resulting from water control structure releases and uncontrolled water flow above [the Georgetown Gauge]. However, [he] is virtually cavalier about ignoring the water levels that result in flooding of bottomland hardwoods once the river passes [the Georgetown Gauge]. It is inconceivable that the [Corps] cannot understand the importance of additional uncontrolled flow to the White River downstream of [the Georgetown Gauge].

Overton Decl. ¶ 7 (emphasis in original). In context, however—particularly considering the Overton Report's extensive analysis of flooding allegedly effected by the Corps Projects, see generally Overton Report—it becomes clear that Dr. Overton inculpates the Corps Projects' controlled flow, see Overton Decl. ¶ 7 ("When the total of the amount of water from the [Corps Projects] on the White River is added to the uncontrolled flow above [the Georgetown Gauge] and then the amount that may be added downstream of [the Georgetown Gauge], the result is periodic consecutive years of flooding . . . . [a]nd the [Corps's] practices have lead [sic] to the destruction of these valuable stands of timber.").

Mindful that causation in these circumstances is a complicated inquiry, the court rejects defendant's contention that the George Trust's crop-land claim is without merit. Cf. Loesch, 645 F.2d at 914 ("Erosion on rivers and streams is an extremely complex matter from the point of view of its genesis, its effects and its prevention."); Hendricks v. United States, 14 Cl. Ct. 143, 149 (1987) ("Causation of flooding is a complex issue which must be addressed by experts."). Greater countervailing evidence existed in both Bartz and Loesch than that which defendant submits in Mr. Schwartz's declaration. In Bartz records of heavy precipitation outweighed plaintiffs' unpersuasive evidence of Corps-caused flood conditions, see 633 F.2d at 574-77, and in Loesch plaintiffs' expert opinion on causation was "a naked one, lacking supportive empirical data and study," 645 F.2d at 915. Although Dr. Overton also implicates uncontrolled flow and Mississippi River backflow in the flooding of the George Trust property, see Overton Decl. ¶ 7, his report plausibly suggests that crop-land flooding and damage—in addition to the timber damage to which his report was oriented—may have been a direct, natural, or probable result of the Corps Projects, see generally Overton Report.

The Corps may have practiced years of undeviating water-control prior to 2003 and plaintiffs' properties may be located on poorly drained marsh-swamps that are removed from Corps water-control structures. Nonetheless, Mr. George has described an unforeseen change in periodic flooding patterns affecting the George Trust's crop-land in 2003, and plaintiffs' expert, Dr. Overton, has analyzed and made findings on the culpability of the Corps Projects for flooding on plaintiffs' properties. Indeed, notwithstanding the Corps's relatively consistent respect for the Georgetown Gauge's guide curves, the Corps earlier had recognized that a majority of the flooding in the vicinity of plaintiffs' properties derived from "headwater sources[] including river flow directly resulting from releases from the [Corps's] water control structures." Overton Report at 10. Causation of flooding is a complex inquiry, and the court must indulge all reasonable inferences in favor of plaintiffs. The alleged taking of the George Trust's crop-land thus stands as a claim upon which relief can be granted. 26/

_____ 26/ For similar reasons, were the court to consider the merits of the Stone Trust's timber claim, defendant's motion for summary judgment for lack of a prima facie showing of causation would fail. Indeed, defendant states that "[t]he Stone Plaintiffs' failure to make a prima facie showing that their claims are not time-barred dovetails with their failure to establish that the Corps's operation of dams no earlier than November 26, 2001 directly and proximately caused the alleged takings." Def.'s Br. filed June 29, 2009, at 12.

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c); see also

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Defendant's motion to dismiss for lack of subject matter jurisdiction is granted as to plaintiffs' claims for a taking of timber in these consolidated actions.  The Clerk of the Court shall dismiss the Stone Trust complaint without prejudice.  No costs.

2. Defendant's motion to dismiss for lack of subject matter jurisdiction is denied as to the George Trust's claim for a taking of crop-land.

---

26/  (Cont'd from page 37.)

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  As the moving party, defendant "has the burden to show 'that there is an absence of evidence to support the nonmoving party's case.'"  Crown Operations Int'l v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir. 2002) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)); see also Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562-63 (Fed. Cir. 1987) (discussing significance of Supreme Court's decisions in Celotex and Anderson to Federal Circuit jurisprudence).  The Supreme Court has defined an issue as genuine "if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant."  Sweats, 833 F.2d at 1562 (citing Anderson, 477 U.S. at 247-48).  The Federal Circuit has detailed the non-moving party's burden as requiring more than "mere assertions" or "conclusory pleadings"; the non-movant must produce "specific facts" pointing to "specific evidence [that] could be offered at trial."  Pure Gold, Inc. v. Syntex (U.S.A.), Inc., 739 F.2d 624, 626-27 (Fed. Cir. 1984) (citing Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984)).

Defendant has not borne its burden.  Although defendant stresses that Dr. Overton and Mr. Blackburn were retained by the George Trust, not the Stone Trust, and that the Stone Trust provides no separate expert analysis, the respective analyses of Dr. Overton and Mr. Blackburn at this point in this consolidated action are imputed to discuss flooding, causation, and flood damage for both plaintiffs' properties.  Cf. McDonald, 37 Fed. Cl. at 116 (imputing lay statements regarding one property to describe conditions on a proximate property).  As hereinbefore described, causation remains a genuine issue.

38

3.  Defendant's motion to dismiss the George Trust complaint for failure to state a claim upon which relief can be granted is denied.

4. By January 13, 2010, the parties shall file a Joint Status Report proposing a schedule for further proceedings in No. 07-816L.


s/  Christine O.C. Miller

_____

Christine Odell Cook Miller
Judge